UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Wiley Y. Daniel**

Civil Action No.  12-cv-00732-WYD-KMT

A.A., a minor, by and through his Next Friend, JUANITA ARCHULETTA,

      Plaintiff,

v.

ALEX MARTINEZ, in his official capacity,
CORNELIUS FOXWORTH, in his individual capacity,
LORENZO SANDOVAL, in his individual capacity;
YANCY MOSELEY, in his individual capacity, and
JOHN DOE, in his individual capacity,

      Defendants.

_____

**ORDER ON MOTION TO DISMISS**
_____

I.    <u>INTRODUCTION</u>

THIS MATTER is before the Court on the Motion to Dismiss filed by Defendant

Cornelius Foxworth ["Foxworth"] on May 31, 2012.  The motion seeks to dismiss the

claims against Foxworth pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6).  A response

was filed on July 8, 2012, and a reply was filed on July 19, 2012.  Thus, the motion is

fully briefed.  Discovery has been stayed pending resolution of this motion as it raises

the defense of qualified immunity.

Foxworth argues in his motion that Plaintiff's claims against him fail to state any

cognizable claim upon which relief may be granted as a matter of law.  Specifically,

Foxworth asserts he is entitled to qualified immunity from the 42 U.S.C. § 1983 claims

as Plaintiff has not alleged specific, non-conclusory allegations to demonstrate any

constitutional violation by him either based on his personal participation or his supervision.  Second, it is argued that Plaintiff's state law claims against Foxworth are barred by the Colorado Governmental Immunity Act ["CGIA"].  Finally, it is argued that Plaintiff's claim for outrageous conduct does not allege sufficient facts independent of his other claims to sustain a claim.

II.    <u>BACKGROUND</u>

Plaintiff A.A. [Plaintiff"], a minor, initiated this civil rights action through his next friend and adoptive mother, Juanita Archuleta, against Foxworth, the former Director of Gilliam Youth Services Center ["Gilliam"], and the other Defendants for injuries which allegedly occurred during the time Plaintiff was detained at Gilliam and the Denver City and County Building.  According to the complaint Plaintiff, age fourteen (14), is a juvenile with multiple disabilities.  (Second Am. Compl. ¶ 2.)  He has been diagnosed with mental retardation, Oppositional Defiant Disorder, severe depression, mental illness, developmental disabilities including but not limited to Attention Deficit Hyperactivity Disorder ["ADHD"], and Fetal Alcohol Syndrome.  (*Id.*)

The Second Amended Complaint alleges federal claims under 42 U.S.C. § 1983 for violation of due process under the Fourteenth Amendment and Eight Amendment against Defendants "John" Robinson ["Robinson"], Lorenzo Sandoval ["Sandoval"], Yancy Moseley ["Moseley"], and Dr. Trina Seefeldt ["Dr. Seefeldt"]; a claim for failure to supervise against Foxworth, John Gomez ["Gomez"], Alex Martinez ["Martinez"], and John Doe ["Doe"]; a failure to train claim against Foxworth, Jamie Nuss ["Nuss"], Gomez, and Martinez; and a failure to protect claim against Dr. Seefeldt, Foxworth, Doe, and Martinez.  Plaintiff also alleges the following state law claims:  negligence

against Defendants Doe, Martinez, Dr. Seefeldt and Robinson; negligent training and supervision against Martinez and Foxworth; outrageous/willful and wanton conduct against Robinson, Sandoval, Mosely, and Foxworth; and intentional infliction of emotional distress against Sandoval, Moseley, and Robinson.[1]  The Second, Third, Fourth, Sixth, and Seventh Claims for Relief are asserted against Foxworth and are thus implicated in his motion to dismiss.

In support of Plaintiff's claims, it is alleged that while detained at Gilliam, Plaintiff was assaulted by peers and staff no less than six (6) times over the course of a few months.  (Second Am. Compl. ¶ 27.)  Plaintiff was in custody in Gilliam in February 2010 and was readmitted on March 5, 2010.  (*Id.* ¶ 28.)  On March 22, 2010, a mental health contact was generated in response to Plaintiff's suicidal statements.  (*Id.* ¶ 29.)  Plaintiff revealed to attending staff psychologist Dr. Seefeldt that he was not suicidal but hoped that by saying he was, he would be removed from his pod (where he reported constant harassment from older juveniles) and transferred elsewhere.  (*Id.*)

On March 23, 2010, Plaintiff was confronted by a peer and received a bloody nose and a "plum-size hematoma" in the middle of his forehead.  (Second Am. Compl. ¶ 30.)  There were then multiple mental health contacts made by Plaintiff (on April 2, 9 and 12, 2010) which allegedly indicated that peers in Plaintiff's pod were habitually victimizing him by picking on him, physically threatening him, and trying to make him angry.  (*Id.* ¶ 31.)  On April 12, 2010, Plaintiff again told Dr. Seefeldt that he was suicidal

---

[1]  Defendants Dr.Seefeldt, Nuss, Gomez and Robinson have been dismissed and taken off the caption.  Also, the seventh and eight claims for relief (outrageous conduct and intentional infliction of emotional distress) have been dismissed as to Defendants Moseley and Sandoval.

and "wished he was dead" because "the whole pod [was] picking on [him]." (*Id.*) Plaintiff again proposed that he be transferred to another pod to resolve the problem; Dr. Seefeldt again rejected his request. (*Id.*) Instead, Dr. Seefeldt wrote that she "spoke further with A.A.'s pod staff and we agreed that the next time A.A. wants to speak with me, we would have a three-way meeting so that we can come up with more concrete solutions to A.A.'s interpersonal issues with other youth on his pod." (*Id.*)

During this time period Plaintiff's adoptive mother Juanita Archuletta allegedly made repeated contacts with Foxworth, Dr. Seefeldt, and other Gilliam staff regarding Plaintiff's disabilities and need for heightened protection and supervision when left with other Gilliam inmates. (Second Am. Compl. ¶ 32.) It is alleged that Dr. Seefeldt and Foxworth "intentionally ignored, and took no action in response to these contacts, electing to conclude that A.A. was not legitimately disabled and presume his difficulties were instead the result of A.A.'s poor judgment and his mother's poor parenting." (*Id.*) Foxworth and Dr. Seefeldt also allegedly ignored A.A.'s mother's pleas to provide Plaintiff with his prescribed ADHD medication to help him with impulse control. (*Id.*) Instead, without explanation, both times Plaintiff was taken into custody at Gilliam he was taken off all his prescribed medication. (*Id.*)

On April 13, 2010, a juvenile peer struck Plaintiff in the face, causing injury and bruising to his right eye and cheek. (Second Am. Compl. ¶ 33.) On April 19, 2010, Plaintiff met with Dr. Seefeldt for a mental health contact regarding the ongoing problems he was having with other youths in his pod. (*Id.* ¶ 34.) It is alleged that Dr. Seefeldt, "despite having been made repeatedly aware of Plaintiff's severe mental health issues, retardation and developmental disabilities by Plaintiff, various

professional advocates for Plaintiff, and Plaintiff's Mother, again ignored these critical diagnoses and instead wrote in her. . .report of the contact that she would 'continue to check in with him' but that 'unless [Plaintiff] can be convinced that his behaviors are contributing to his being in trouble, it appears unlikely that he will want to change.'" (*Id.*)

Plaintiff was released from Gilliam on April 20, 2010, but was returned on May 6, 2010 for a probation violation. (Second Am. Compl. ¶ 35.) On May 13, 2010, Gilliam staff member William Pride ["Pride"] was arrested for arranging a fight between two jailed youth offenders. (*Id.* ¶ 37.) Plaintiff alleges that while on duty at Gilliam, Pride brought a juvenile over from an adjacent pod to assault a juvenile in his room. (*Id.*)

On May 14, 2010, Plaintiff allegedly overheard Defendant Sandoval tell one of Plaintiff's peers (in front of the large group of youths Sandoval was supposed to be supervising) that he would "buy [him] a McDonald's" if he "beat [Plaintiff] up." (Second Am. Compl. ¶ 38.) On May 15, 2010, Plaintiff alleges he was confronted by a peer and struck in the face, injuring his nose and chipping his front tooth. (*Id.* ¶ 39.)

On May 18, 2010, Plaintiff was allegedly finally placed on a special program which Foxworth and Dr. Seefeldt asserted would increase his supervision and protect him from further assaults by his peers. (Second Am. Compl. ¶ 40.) However, on May 31, 2010, Defendant Moseley, a supervisor employed by Gilliam, allegedly physically assaulted Plaintiff by kicking him in the chest, ripping Plaintiff's shirt, and dragging him through the facility, causing Plaintiff injury, humiliation and emotional trauma. (*Id.* ¶ 41.)

On June 2, 2010, Plaintiff was transported by the Denver Sheriff's Department to the Denver City and County Building for a court appearance and placed in a holding cell with several other peers from Gilliam. (Second Am. Compl. ¶ 42.) Plaintiff alleges:

Almost immediately after being placed in the cell, A.A. was attacked by the other youths.  From approximately 8:35 to 9:35 AM, A.A. was assaulted, kicked, beaten, spit on and punched.  A videotape  of the incident reveals that the five (5) of the seven (7) juveniles placed in the cell unsupervised with Plaintiff proceeded to take turns spitting on and striking A.A. in the holding cell for over an hour.  The video reveals that the juveniles also took turns urinating in the toilet, soaking articles of A.A.'s clothing – such as his shoes – in the urine-filled toilet, and forcing A.A. to put the urine-soaked items back on his body.  Absolutely no one – law enforcement or otherwise – intervened to stop this attack on Plaintiff.  In fact, by the time an employee of the Denver Sheriff's Department (possibly Defendant Doe) returned to remove A.A. from the holding cell and take him into court, the attack was over.  A.A. had to report the assault himself.

(*Id.*)

Plaintiff was thereafter transported to the emergency room at Denver Health Medical Center where he was diagnosed with a closed head injury, laceration to his face, facial bruising, rib bruising, and hematuria, blood in his urine.  (Second Am. Compl. ¶ 42.)  This attack allegedly "occurred as a direct result" of Defendant Doe's "willful failure to supervise the youths in the holding cell and the Denver Sheriff Department's failure to train its deputies and institute policies to ensure such supervision is in place."  (*Id.*)

Finally, on July 30, 2010, Plaintiff was again transported to the emergency room at DHMC for a large laceration to his lower left leg.  (Second Am. Compl. ¶ 43.)  This was allegedly caused by a peer at Gilliam's recreation center who had pushed Plaintiff down and then stabbed him in the leg with a knife.  (*Id.*)

The complaint alleges that "throughout Plaintiff's detention at Gilliam, A.A. was denied contact and visitation with his mother, who represents Plaintiff's entire support system, due to the Gilliam staff reacting to A.A.'s undesirable or impulsive behavior by writing him up and placing him on 'sanction status' nearly every single day he was

detained at Gilliam."  (Second Am. Compl. ¶ 44.)  It was allegedly the express policy and regular practice of Gilliam to deny, as punishment, all phone access and visitation to inmates placed on "sanction status."  (*Id.*)

Also throughout Plaintiff's detention at Gilliam, it is alleged that his adoptive mother "attempted to contact – in writing, by phone and in person – Director Foxworth, staff psychologist Dr. Seefeldt, the Attorney General, Director Gomez, the Division of Youth Corrections, and the Department of Human Services regarding the severity of Plaintiff's disabilities, his limited cognitive functioning, fetal alcohol syndrome and multiple psychological disorders and his need for regular contact with his mother regardless of his 'sanction status.'"  (Second Am. Compl. ¶ 45.)  "Various advocates for A.A., including Dr. Pam Gillen, an expert in the presentation and mental health implications of fetal alcohol syndrome and Director of the Colorado Fetal Alcohol Syndrome Prevention Program, Deborah Ward White, Director of the Family Agency Collaboration, and Patricia Doyle, Advocate/Investigator for The Legal Center for People with Disabilities and Elder People, also contacted Gilliam, the Attorney General, and Foxworth throughout Plaintiff's detention regarding his disabilities, the critical nature of his being permitted visitation with his mother regardless of 'sanction status,' his heightened vulnerability to assaults from other youths, and the need for Gilliam to move quickly and take affirmative steps to protect A.A. from further harm.  (*Id.*)

Foxworth and others are alleged to have ignored these contacts and recommendations.  (Second Am. Compl. ¶ 45.)  Instead, they "continued to treat A.A. as a normal, non-disabled inmate on 'sanction status,' denying him contact or visitation with his mother, which by virtue of A.A.'s special needs and multiple disabilities, caused

him severe and significant emotional distress and exacerbated the presentation of symptoms in his already-underlying mental and emotional disorders." (*Id.*)

Defendants' conduct is alleged to have proximately caused the deprivation of Plaintiff's constitutionally-protected rights. (Second Am. Compl. ¶ 46.) It is alleged that "[d]ue to Defendants' actions and failures to act, failures to supervise or protect Plaintiff, negligence and outrageous conduct, A.A. suffered repeated injury, repeated pain, regular humiliation, and repeated suffering." (*Id.*)

III.   ANALYSIS

A.   Standard of Review

Foxworth moves to dismiss the § 1983 claims under Fed. R. Civ. P. 12(b)(6). Under that rule, the court must "accept all well-pleaded facts as true and view them in the light most favorable to the plaintiff." *Jordan-Arapahoe, LLP v. Bd. of Cnty. Comm'rs*, 633 F.3d 1022, 1025 (10th Cir. 2011). Plaintiff "must allege that 'enough factual matter, taken as true, [makes] his claim for relief ... plausible on its face.'" *Id.* (quotation and internal quotation marks omitted). "A claim has facial plausibility when the [pleaded] factual content [ ] allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (quoting *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1940 (2009)). Plaintiff "must include enough facts to 'nudge[] [his] claims across the line from conceivable to plausible.'" *Dennis v. Watco Cos., Inc.*, 631 F.3d 1303, 1305 (10th Cir. 2011) (quotation omitted). Conclusory allegations are not sufficient to survive a motion to dismiss. *Gallagher v. Shelton*, 587 F.3d 1063, 1068 (10th Cir. 2009).

The Tenth Circuit has stated that "if matters outside the pleading are presented to and not excluded by the court, [a Rule 12(b)(6) motion] shall be treated as one for

summary judgment and disposed of as provided in Rule 56. . . ." *David v. City & Cnty. of Denver*, 101 F.3d 1344, 1352 (10th Cir. 1996).  Conversion of a motion to dismiss to a Rule 56 motion is also proper where the plaintiff's response attaches materials outside the pleadings which are considered by the court in deciding the motion.  *See Whitesel v. Sengenberger*, 222 F.3d 861, 866 (10th Cir. 2000).  However, courts have broad discretion in determining whether or not to accept materials beyond the pleadings. *Lowe v. Town of Fairland,* 143 F.3d 1378, 1381 (10th Cir. 1998).

In this case, Plaintiff attached materials to his response which he argued should be considered in connection with the federal claims sought to be dismissed under Rule 12(b)(6).  I find that these materials are not necessary to resolution of Defendant's motion, and I will not consider them in connection with the federal claims that Foxworth seeks to dismiss under Fed. R. Civ. P. 12(b)(6).  Thus, I am not required to convert the motion to dismiss into a summary judgment motion.

Foxworth also moves to dismiss the state law claims under Fed. R. Civ. P. 12(b)(1).  A motion to dismiss under Rule 12(b)(1) can be either a facial attack on the sufficiency of the allegations in the complaint as to subject matter jurisdiction or a challenge to the actual facts upon which jurisdiction is based.  *Ruiz v. McDonnell*, 299 F.3d 1173, 1180 (10th Cir. 2002).  Here, Foxworth mounts a factual attack to subject matter jurisdiction, arguing that the state claims are barred under the CGIA.

B.    Whether Dismissal of Plaintiff's Claims against Foxworth is Appropriate

1.    Outrageous Conduct Claim

Plaintiff agrees with Foxworth's argument as to his outrageous conduct claim, and does not object to the granting of the motion to dismiss as to this claim against

Foxworth.  Accordingly, I grant Foxworth's Motion to Dismiss as to the outrageous conduct claim–the seventh claim for relief–and it is dismissed as to Defendant Foxworth only.  I now turn to the other claims.

    2. Federal Claims

   Foxworth argues that he is entitled to qualified immunity on the federal civil rights claims asserted again him in his individual capacity.  Foxworth asserts that Plaintiff has not demonstrated that he personally participated in any violation of Plaintiff's constitutional rights or that he violated Plaintiff's rights based on any action he failed to take as a supervisor at Gilliam.

   Turning to my analysis, government officials performing discretionary functions are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known.  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)  *Harlow* places a presumption in favor of immunity of public officials acting in their individual capacities.  *Schalk v. Gallemore*, 906 F.2d 491, 499 (10th Cir. 1990).  In order to determine whether qualified immunity applies, the court must conduct a two-part inquiry."  *Douglas v. Dobbs*, 419 F.3d 1097, 1100 (10th Cir. 2005).  First, the court must determine "whether the facts alleged, viewed in the light most favorable to the party asserting injury, show the official's conduct violated a constitutional right."  *Id.*  Second, the court must determine "'whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'"  *Id.* at 1101 (quotation omitted).[2]

---

[2] There is also a third inquiry that applies when "'extraordinary circumstances' prevent officials from knowing that their conduct violates a clearly established right."  *Id.* (quotation omitted).  This inquiry is

"[O]rdinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Medina v. City and Cnty. of Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992). The contours of the right "'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Douglas*, 419 F.3d at 1101 (quotation omitted). The burden is on the plaintiff to show that the law was clearly established at the time of the alleged violation. *Dixon v. Richer*, 922 F.2d 1456, 1460 (10th Cir. 1991).

I find that Plaintiff's Second Amended Complaint sufficiently alleges a violation of a clearly established constitutional right. In 1982, well before the allegations in this case, the Supreme Court held under the Due Process Clause of the Fourteenth Amendment that an involuntarily committed mental patient "enjoys constitutionally protected interests in conditions of reasonable care and safety, reasonably nonrestrictive confinement conditions, and such training as may be required by those interests." *Youngberg v. Romeo*, 457 U.S. 307, 324 (1982)). Indeed, the substantive component of the Due Process Clause requires the state to provide involuntarily committed mental patients "with such services as are necessary to ensure their "reasonable safety" from themselves and others." *DeShaney v. Winnebago Cnty. Dep't of Social Servs.*, 489 U.S. 189, 199 (1989). Further, the law was clearly established that state officials had a duty to protect other individuals whom they had taken

---

inapplicable here as Foxworth has not asserted the existence of any extraordinary circumstances.

involuntarily into their physical custody and control. *Liebson v. New Mexico Corr. Dep't*, 73 F.3d 274, 277 (10th Cir. 1996) (citing *DeShaney*, 489 U.S. at 195-97). This includes juveniles or children who are confined in state facilities. *Yvonne L., by and through Lewis v. New Mexico Corr. Dep't*, 959 F.2d 883, 893 (10th Cir. 1992) (citing *Milonas v. Williams*, 691 F.2d 931, 942 (10th Cir. 1982) and other cases); *see also Whitley v. New Mexico Children, Youth & Family Dep't*, 184 F. Supp. 2d 1146, 1155 (D. N.M. 2001).

Those cases clearly show that Plaintiff, as a juvenile with mental impairments who was detained in a state facility, had clearly established rights under the substantive due process clause to reasonable care and safety as well as such training as may be required by those interests.[3] This is known as the "special relationship" doctrine, that "'exists when the state assumes control over an individual sufficient to trigger an affirmative duty to provide protection to that individual. . . .'" *Whitley*, 184 F. Supp. 2d at 1154 (quoting *Uhlrig v. Harder*, 64 F.3d 567, 562 (10th Cir. 1995)).

The complaint on its face implicates the right to reasonable care and safety, as Plaintiff complains that Defendants did not house him in a safe environment or protect him from physical assaults. (Second Am. Compl. ¶ 1.) Indeed, it is alleged that the constitutional violations arise out of Defendants' "repeated failures to supervise, intervene, or protect Plaintiff caus[ing] him to sustain a stab wound to his leg, facial bruising, a chipped front tooth, closed head injury, a large laceration to the left side of his face, bruising to the ribs, and a severe hematuria resulting from kidney injury during

---

[3] While Plaintiff also asserts a claim under the Eighth Amendment, this does not apply as Plaintiff is not incarcerated.

the period from April 13, 2010 to July 30, 2010." (*Id.* ¶ 3.)  These incidents are described in detail in the complaint.  (*Id.* ¶¶ 29-43.)

Plaintiff also alleges that while detained at Gilliam, he was "denied adequate or competent staff supervision and that the acts, omissions, policies and practices of the Defendants were knowing, deliberately indifferent, and/or intentional, in disregard for the safety and well-being of Plaintiff. . . ." (Second Am. Compl. ¶ 5.)  Further, he alleges that Defendants failed to provide sufficient care or treatment for Plaintiff.  (*Id.* ¶¶ 76, 77, 98, 129, 134.)  Examples of this include the fact that he was taken off his medications while at Gilliam despite "his mother's pleas to provide Plaintiff with his prescribed ADHD medication. . .to help him with impulse control." (*Id.* ¶ 32.)  Further, it is alleged that Plaintiff was denied contact and visitation with his mother, his "entire support system" (*id.* ¶ 44), despite being advised "regarding A.A.'s disabilities and the critical nature of his being permitted visitation with his mother regardless of "sanction status".  (*Id.* ¶ 45.) The allegations "describe adequately the various incidents and conduct that constitute the deprivation"; thus, they "do more than merely 'identif[y] a clearly established right and then alleg[e] that defendant has violated it.'" *Neiberger v. Hawkins*, 6 F. App'x 683, 687 (10th Cir. 2001) (quotation omitted).

I also find that the right allegedly violated was "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  Foxworth serves as Director of the Gilliam facility. As in the *Neiberger* case, "[a] reasonable person in such a position should know that. . . [juveniles detained in the facility] enjoy a constitutionally protected interest in conditions of reasonable care and safety, and that allowing or implementing policies resulting in

-13-

the acts alleged in the complaint would violate that interest." *Neiberger*, 6 F. App'x at 687; *see also Yvonne L.*, 959 F.2d at 893 (finding in 1992 that officials sued in connection with the foster care system were "clearly alerted . . . that children in the custody of a state had a constitutional right to be reasonably safe from harm. . .").

However, I still must determine whether Plaintiff's allegations relating to the conditions and treatment at Gilliam, if proven, would constitute a violation of these rights by Foxworth specifically, *i.e.*, whether Plaintiff has pled personal participation on the part of Foxworth.  Foxworth argues that Plaintiff cannot overcome his entitlement to qualified immunity from the § 1983 claims against him for two reasons: (1) Plaintiff has not sufficiently alleged any constitutional violation by Foxworth personally; and (2) Plaintiff has not alleged any specific facts demonstrating any affirmative link between any action or omission by Foxworth and any violation of Plaintiff's constitutional rights.

In order to hold Foxworth liable, Plaintiff must demonstrate that Foxworth "knew of the asserted danger to [P]laintiff[] or failed to exercise professional judgment with respect thereto" and "an affirmative link to the injuries" Plaintiff suffered.  *Yvonne L.*, 959 F.2d at 890.  Courts must show deference to the judgment exercised by a qualified professional.  *Youngberg*, 457 U.S. at 322.  "[T]he decision, if made by a professional, is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* at 323.

While Foxworth argues that the deliberate indifference standard applies, I disagree based on the holdings of *Yvonne L.* and *Youngberg*.  However, I note that the

Tenth Circuit has expressed "doubt" that there is "much difference in the two standards",

since "'[f]ailure to exercise professional judgment does not mean mere negligence. . .;

while it does not require actual knowledge the children will be harmed, it implies

abdication of the duty to act professionally. . . ." *Yvonne L.*, 959 F.3d at 894.  The Tenth

Circuit further noted that "[t]he compelling appeal of the argument for the professional

judgment standard is that foster children, like involuntarily committed patients, are

'entitled to more considerate treatment and conditions' than criminals." *Id.*

(quoting *Youngberg*, 457 U.S. at 321-22).  I believe that this same argument would

apply to a juvenile with mental disabilities who is detained in a juvenile detention facility.

    Thus, in the case at hand, Plaintiff must show that Foxworth knew of the asserted

danger to Plaintiff or failed to exercise professional judgment with respect thereto and

an affirmative link to the injuries Plaintiff suffered.  I first address the affirmative link.

This link may be shown as to a defendant supervisor either through his "personal

participation, his exercise of control or direction, or his failure to supervise.'" *Poolaw v.

Marcantel*, 565 F.3d 721, 732 (10th Cir. 2009) (quotation omitted).  Direct participation

is not necessary; "'[t]he requisite causal connection is satisfied if the defendant set in

motion a series of events that the defendant knew or reasonably should have known

would cause others to deprive the plaintiff of h[is] constitutional rights.'" *Id.* at 732-33

(quotation omitted); *see also Jenkins v. Wood*, 81 F.3d 988, 995 (10th Cir. 1996)

(supervisor liable if he had "knowledge of the violation and acquiesced in its

continuance").

    In his complaint, Plaintiff specifically alleges Foxworth's "affirmative link" to the

constitutional violations suffered by him as well as Foxworth's knowledge of same.  The

complaint alleges that "Foxworth, while Director of Gilliam. . ., was made repeatedly aware of A.A.'s need for heightened supervision and additional protection through the multiple contacts made by Plaintiff's adoptive mother, Juanita Archuletta", as well as other advocates for Plaintiff.  (Second Am. Compl. ¶ 15.)  It is alleged that "Foxworth intentionally and willfully ignored these contacts, remaining deliberately indifferent to A.A.'s safety and constitutional rights, causing A.A. to be subjected to additional physical attacks and injury."  (*Id.*)

Plaintiff also alleges that the March 23, 2010 attack served "as clear notice" to Foxworth "regarding his various vulnerabilities and disabilities and how they heightened the risk of Plaintiff being physically attacked when left alone or unsupervised with his fellow Gilliam inmates."  (Second Am. Compl. ¶ 10a.)  Further, it is alleged that as of April 12, 2010, "Foxworth . . . had sufficient notice and information regarding the heightened risk to Plaintiff's safety when placed unsupervised with his Gilliam peers." (*Id.* ¶ 100.)  "Despite possessing such information, Defendant Foxworth failed to provide Plaintiff with one-on-one supervision and Plaintiff was attacked and injured on several subsequent occasions."  (*Id.*)

These attacks were allegedly "preventable if . . .Foxworth had taken any steps at all to protect Plaintiff from this known and documented risk to his safety."  (Second Am. Compl. ¶ 100.)  Indeed, it is alleged that "Foxworth failed to intervene, investigate or remedy the violations of Plaintiff's constitutional rights committed by Defendants Sandoval, Moseley and Robinson, and instead chose to acquiesce in and/or ignore their unconstitutional conduct, even after another one of Defendant Foxworth's employees – William Pride – was *arrested* by police for enticing and arranging for Gilliam youths to

fight one another for his own entertainment." (*Id.* ¶ 61 (emphasis in original), *see also* ¶¶ 49-50–Foxworth was allegedly aware of his staff's practice of arranging and encouraging fights between detained juveniles and, upon notice, did nothing to prevent his staff from continuing the unconstitutional practice.)

Further, Foxworth was allegedly "contacted personally by other medical health professionals on A.A.'s behalf during this time, all reiterating and emphasizing A.A.'s disabilities and resultant need for heightened protection from other violent or confrontational inmates at Gilliam." (Second Am. Compl. ¶ 15.)  Foxworth allegedly willfully and wantonly rebuffed these contacts, and. . .not only refused to accommodate Plaintiff's disabilities by increasing his supervision and protection, but further refused to even recognize the existence of Plaintiff's disabilities, openly blaming and attributing Plaintiff's injuries to A.A. and his adoptive mother instead." (*Id.*)  This is alleged to have caused Plaintiff, by virtue of his "special needs and multiple disabilities", severe and significant emotional distress and exacerbated the presentation of symptoms in his already-underlying mental and emotional disorders." (*Id.* ¶ 45.)

There are also allegations that show Foxworth exercised discretion or control in regard to Plaintiff's treatment while at Gilliam.  Thus, Foxworth is alleged to have ignored Plaintiff's mother's pleas to provide Plaintiff with his prescribed ADHD medication while detained in Gilliam, and continued treating Plaintiff as though he were non-disabled and not mentally retarded when it came to placing and keeping Plaintiff on "sanction status: for nearly his entire stay at Gilliam.  (Second Am. Compl. ¶ 54.)

Further, there are allegations that show Foxworth set in motion a series of events that he knew or reasonably should have known would cause others to deprive Plaintiff

-17-

of his constitutional rights.  This includes a lack of training and supervision of the Gilliam

staff.  Thus, it is alleged that Foxworth "was responsible for providing adequate

supervision and training to Gilliam staff and employees to ensure that juvenile prisoners

– particularly those with developmental disabilities and limited cognitive functioning –

kept in the care and custody of Gilliam would be kept reasonably safe and to ensure

that reasonably foreseeable injuries or harm to those juveniles would be avoided."

(Second Am. Compl. ¶ 129.)

Also, Foxworth was allegedly "responsible for instituting policies and practices at

Gilliam to ensure that juveniles with disabilities or mental health disorders detained at

Gilliam were adequately protected and their particular special needs reasonably

accommodated."  (Second Am. Compl. ¶ 76.)  "Inherent to this duty was Defendant

Foxworth's concomitant responsibility to ensure that all the employees and staff at

Gilliam possessed sufficient training to identify and respond appropriately to the higher

vulnerability and heightened risk factors associated with special needs and mentally

disabled juveniles."  (*Id.*)  Foxworth allegedly "failed to institute any policies or practices

to ensure that juveniles with disabilities or mental health disorders would receive

increased levels of supervision or protection at Gilliam" and "similarly failed to

adequately train Gilliam staff and employees regarding how to treat, supervise, respond

to, and/or reasonably accommodate the special needs of mentally disabled and

developmentally challenged juveniles such as Plaintiff."  (*Id.* ¶ 77.)

As to Plaintiff specifically, it is alleged that Foxworth "failed to adequately

supervise and/or train the Gilliam staff with respect to ensuring Plaintiff's safety while in

the care and custody Gilliam after receiving ample notice of Plaintiff's heightened need

for supervision and protection following the first several incidents, attacks, and mental health contacts brought to Gilliam's attention by Plaintiff on March 23, April 2, April 9, April 12, and April 13, 2010." (Second Am. Compl. ¶ 15.)  As "a direct and proximate result" of Foxworth's "failure to properly train the employees at Gilliam regarding special needs and disabled juveniles" and his failure to supervise, Plaintiff allegedly suffered the injuries described"in the complaint.  (*Id.*, ¶¶ 62, 78; *see also* ¶¶ 98-101, 129-130.)

Finally, Plaintiff alleges that "Foxworth's conduct with respect to what was nothing less than the systematic and intentional emotional and physical abuse of inmates by the Gilliam staff breached his duty to exercise reasonable care in the training and supervision of his subordinate employees and agents at Gilliam." (Second Am. Compl. ¶ 130.)  "Gilliam staff member William Pride's arrest on May 13, 2010 for setting up a fight between two Gilliam inmates as followed two days later by Sandoval's offer to some youths that he would 'buy a McDonald's' for whomever 'beats [A.A.] up,' indicates that the abuse. . .on the youths detained at Gilliam by Gilliam staff was not an 'isolated incident' but was instead systematic and a regular practice." (*Id.*)  Foxworth "breached his duty to exercise reasonable care in the supervision of his subordinate employees at Gilliam when he created an atmosphere where the practice could occur and allowed this practice to continue uninterrupted following Pride's arrest, which caused Plaintiff to suffer physical injury and emotional distress on May 15, 2010." (*Id.*)

While Foxworth argues that Plaintiff failed to adequately state a claim for failure to train and failure to supervise, I disagree based on the above allegations.  When a plaintiff sues an official under . . . §1983 for conduct 'arising from his or her superintendent responsibilities,' the plaintiff must plausibly plead and eventually prove

-19-

not only that the official's subordinates violated the Constitution, but that the official *by virtue of his own conduct and state of mind* did so as well." *Dodds*, 614 F.3d at 1198 (emphasis added) (quoting *Iqbal*, 129 S. Ct. at 1949).  The allegations referenced above, accepted as true and construing them in the light most favorable to Plaintiff, plausibly supports a claim that Foxworth–by virtue of his own conduct and state of mind–violated Plaintiff's constitutional rights by failing to properly supervise the employees at the Gilliam facility.  Contrary to Foxworth's argument, the allegations can be construed as showing his awareness of unconstitutional actions taken against Plaintiff and/or support an inference that he knowingly failed to take some action.

I also find that the above allegations support liability based on policies at Gilliam. Section 1983 "allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which 'subjects, or causes to be subjected' that plaintiff 'to the deprivation of any rights ... secured by the Constitution ....'" *Dodds*, 614 F.3d at 1199 (quotation omitted).  The allegations could plausibly support a claim that Foxworth possessed responsibility for enacting policies to keep mentally/developmentally challenged juveniles safe and that his failure to do so caused the complained of constitutional harm.  *Id*.  Further, given the allegations of notice that Foxworth had regarding Plaintiff's vulnerabilities as well as the fact that assaults were occurring against Plaintiff and his failure to act, he could plausibly be found to have the state of mind required to establish the alleged constitutional violation.  *Id*.  In other words, he

could be liable for adopting a plan or policy, "express or otherwise –showing [his] authorization or approval of such misconduct." *Id.* at 1201.

I also find that Plaintiff's allegations show that a jury could find Foxworth had knowledge of the violations and acquiesced in their continuance. Further, construing the allegations in the light most favorable to Plaintiff at this stage of the litigation, it is plausible that Foxworth exercised a lack of professional judgment. Finally, I find at this stage of the allegation that, accepting as true Plaintiff's allegations, Foxworth acted in a manner that shocks the conscience. *See Uhlrig*, 64 F.3d at 572 ("[i]n order to prevail on their substantive due process claim, Plaintiffs must demonstrate that the state acted in a manner that 'shock[s] the conscience'" (quotation and internal quotation marks omitted). These issues will need to be fleshed out in the evidence, and are not appropriate for resolution in connection with Foxworth's motion to dismiss.

Even if the deliberate indifference standard applied rather than the professional judgment rule, I find that Plaintiff's allegations are sufficient to survive a motion to dismiss on this issue. The deliberate indifference requirement provides that a prison official must act wanton or willfully and have a "'sufficiently culpable state of mind'". *Farmer v. Brennan*, 511 U.S. 825, 834-35 (1994) (quotation omitted). "'[D]eliberate indifference entails something more than mere negligence. . .[but] something less than acts or omissions for the very purpose of causing harm or with the knowledge that harm will result.'" *DeSpain v. Uphoff*, 264 F.3d 965, 972 (10th Cir. 2001) (quoting *Farmer*, 511 U.S. at 835).

The test for deliberate indifference is both objective and subjective. *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009). "The objective component of the test is

met if the 'harm suffered rises to a level sufficiently serious to be cognizable under the Cruel and Unusual Punishment Clause' of the Eighth Amendment." *Id.* (quotations omitted). I find that the objective test is met in this case because the harm suffered rises to a level sufficiently serious to be cognizable under the Cruel and Unusual Punishment Clause of the Eighth Amendment. Indeed, Plaintiff is alleged to have suffered physical assaults at the hands of Foxworth's employees. This element is not contested by Foxworth. Thus, I turn to the subjective element.

To prevail on the subjective component of the deliberate indifference test, a plaintiff must show that the defendant "knew he faced a substantial risk of serious harm and disregarded that risk, by failing to take reasonable steps to abate it." *Martinez*, 563 F.3d at 1089. To recklessly disregard a risk, "[a] prison official must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw that inference." *Farmer,* 537 U.S. at 837. "The factfinder may conclude that a prison official subjectively knew of the substantial risk of harm by circumstantial evidence or 'from the very fact that the risk was obvious.'" *Martinez*, 563 F.3d at 1089 (quotation marks omitted).

In the case at hand, the allegations that Foxworth was advised of Plaintiff's vulnerability due to his mental and developmental disabilities, had notice of assaults against Plaintiff and did nothing about it supports a finding that Foxworth subjectively knew of the substantial risk of harm and failed to take reasonable steps to alleviate that risk. In other words, I find that it would be possible for a factfinder to infer from these allegations that Foxworth "acted or failed to act despite his knowledge of a substantial risk of serious injury." *Farmer,* 537 U.S. at 842. I further find that these allegations, if

true, could amount to more than mere negligence, and that discovery should be conducted so that the details of this claim can be fleshed out.

In conclusion, accepting Plaintiff's allegations as true as I must for purposes of the motion to dismiss, I find that Plaintiff has presented a plausible claim that Foxworth's actions violated a constitutional right of due process and that this right was clearly established at the time of Defendants' unlawful conduct. I also find that Plaintiff's allegations are sufficient to state an affirmative link between Foxworth's conduct and the alleged constitutional violations. Finally, I find that the allegations, if proven at trial, are conscience shocking. Thus, they are sufficient to survive Foxworth's motion to dismiss. *See Dodds*, 614 F.3d at 1203-04 ("the facts, taken in the light most favorable to Plaintiff, show Defendant may have played more than a passive role in the alleged constitutional violation. . . . Plaintiff has thereby presented facts that establish personal involvement by Defendant in the alleged constitutional violation sufficient to satisfy § 1983.") Foxworth's motion to dismiss arguing that the federal claims should be dismissed based on qualified immunity or failure to show personal participation or supervisory liability is thus denied.

3.    Plaintiff's Negligent Supervision and Training Claim

Foxworth also argues that Plaintiff's sixth claim for negligent training and supervision and seventh claim for outrageous conduct are barred by the CGIA. The outrageous conduct claim has already been dismissed; thus, I must determine whether the CGIA bars the negligent training and supervision claim.

A civil action against a public employee is subject to the provisions of the CGIA. The CGIA defines a "public employee" as "an officer, employee, servant, or authorized

volunteer of the public entity…." Colo. Rev. Stat. § 24-10-103(4)(a).  In turn, "public

entity" means, "the state, county, city and county, municipality, school district, special

improvement district, and every other kind of district, agency, instrumentality, or political

subdivision thereof…." *Id.* § 24-10-103(5).

I find that Foxworth is a public employee within the meaning of the CGIA

because at all times relevant hereto he was an employee of the State of Colorado,

working as the Director of Gilliam.  Gilliam is an instrumentality of the State of Colorado

as it is a facility operated by the Department of Human Services, an agency of the State

of Colorado.  *See* Colo. Rev. Stat. § 24-1-120(7)(i); *People v. Sommerfeld,* 214 P.3d

570, 572 (Colo. App. 2009) (describing purpose and responsibilities of the Department

of Human Services including operating juvenile detention facilities).  These facts are not

disputed by Plaintiff.

A public entity or employee is immune from all claims that lie or could lie in tort,

unless the claim falls within one of the six limited areas for which immunity has been

waived or unless the act or omission causing the injury was willful and wanton." *Moody*

*v. Ungerer*, 885 P.2d 200, 204 (Colo. 1991) (citing Colo. Rev. Stat. § 24-10-118(2)).

Foxworth argues that Plaintiff's state law claims do not fall within any of the areas where

the CGIA has waived Foxworth's sovereign immunity.  *See* Colo. Rev. Stat. § 24-10-

106(1).  Plaintiff argues, however, that § 24-10-106(1)(b) applies.  That provision

provides that sovereign immunity has been waived for "[t]he operation of any public

hospital, correctional facility, as defined in section 17-1-102, C.R.S., or jail by such

public entity."

I agree with Foxworth that Plaintiff has not shown that a juvenile detention facility such as Gilliam is a "correctional facility" or a "jail" within the meaning of this statutory provision.  Initially, a "correctional facility" is defined as "any facility under the supervision of the department [of corrections] in which persons are or may be lawfully held in custody as a result of conviction of a crime."  Colo. Rev. Stat. § 17-1-102(1.7) (alteration added based on the definition of "Department" found at § 17-1-102(2)). Plaintiff has not been convicted of a crime.

Further, while the CGIA does not define "jail," the definitions of "jail" under Colorado law support a finding that a jail is distinct from a juvenile detention facility. *See, e.g.,* Colo. Rev. Stat. § 17-1-102(7) (defining "local jail" as a jail or an adult detention center of a county or city and county); *Id.* § 17-26-101 (providing that there shall be a jail in each county in the state).  Finally, both Colorado statutes and Colorado cases differentiate between juvenile detention facilities and jails or correctional facilities for a variety of different purposes including the confinement of juveniles.  *See, e.g., People v. Juvenile Court, City & Cnty. of Denver,* 915 P.2d 1274, 1276-77 (Colo. 1996) (describing when a juvenile can tried as an adult and noting that "[g]enerally, the Children's Code prohibits the confinement of a child in an adult detention facility such as a county jail"); Colo. Rev. Stat. § 17-26-121 (providing that jails are prohibited from receiving juvenile offenders except for specific statutory circumstances); *Id.* § 19-2-907 (providing options for sentencing of juvenile offenders and distinguishing between commitment to the Department of Human Services versus confinement in a county jail or in community corrections); *Id.* § 19-2-910 (providing for the circumstances of when a juvenile can be sentenced to the Department of Human Services versus a county jail or

a community corrections facility); *Id.* § 25-1.5-301 (differentiating between jails, community corrections, and institutions for juveniles for purposes of public administration of medication); *Id.* § 25.5-4-205.5 (differentiating between correctional institutions, jails, juvenile commitment facilities, and Department of Human Services facilities for purposes of administration of medication).

Based on the foregoing, the distinction between a juvenile detention facility and a jail or correctional facility appears to be well recognized under Colorado law.  As a result, I find no basis to expand the waived area provided by Colo. Rev. Stat. § 24-10-106(1)(b) to include juvenile detention facilities such as Gilliam.  Had the Colorado General Assembly wanted to waive sovereign immunity for the operation of juvenile detention facilities it could have chosen to do so.  I acknowledge Plaintiff's argument that this finding would provide juvenile detainees less protection than an convicted adult prisoner.  However, I must respect the state legislature's policy choice and leave it up to the legislature to change the policy if needed.[4]

IV.   CONCLUSION

In conclusion and for the reasons stated above, it is

ORDERED that Foxworth's Motion to Dismiss filed on May 31, 2012 (ECF No. 28) is **GRANTED IN PART AND DENIED IN PART**.  It is **DENIED** as to the federal claims asserted under 42 U.S.C. § 1983 and **GRANTED** as to the outrageous conduct claim and the negligent supervision and training claim.  The negligent supervision and training (the sixth claim for relief)is **DISMISSED** as to all Defendants.  The outrageous

---

[4] While Plaintiff requests that I allow further briefing or set the matter for oral argument before granting the motion to dismiss on this issue, I find that this is unnecessary.

conduct claim (the seventh claim for relief) is **DISMISSED** as to Defendant Foxworth only.

Dated:  November 19, 2012

BY THE COURT:

s/ Wiley Y. Daniel
Wiley Y. Daniel
Chief United States District Judge